IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| LANDRIE A. LOVE, | * | |
| *Plaintiff*, | * | Civil Action No. RDB-23-2632 |
| | * | |
| v. | * | |
| | * | |
| WAYFAIR, LLC, | * | |
| *Defendant*. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Through the above-captioned litigation, Plaintiff Landrie A. Love ("Love" or "Plaintiff") advances four claims against his former employer, Defendant Wayfair, LLC ("Wayfair," the "Company," or "Defendant"). (ECF No. 1.)[1] Specifically, Love advances three federal claims under the Americans with Disability Act (the "ADA"), 42 U.S.C. §§ 12101–12213—a claim for discrimination (Claim One), a claim for retaliation (Claim Two), and a failure to accommodate claim (Claim Three)—as well as a state claim for wrongful termination (Claim Four). In brief, Love alleges that Wayfair terminated his brief[2] employment after he suffered a workplace injury on February 16, 2023, which he claims resulted in disability—namely, he contends that the accident resulted in a concussion that

---

[1] For clarity, this Memorandum Opinion cites to the ECF generated page number, rather than the page number at the bottom of the parties' various submissions, unless otherwise indicated. Likewise, this Memorandum Opinion cites to the ECF generated document number, rather than the exhibit number provided by the parties' various submissions.

[2] Love worked at Wayfair for a little over three months. (ECF No. 29-3 at 6:4–6, 7:13–16, 14:11–13, 72:19–74:22, 105–07, 118–19; ECF No. 29-5 at 4 ¶ 22, 8–9.)

allegedly substantially impaired his ability to work, sleep, and think—and further required him to request certain workplace accommodations and to submit a workers' compensation claim. According to Wayfair, the Company terminated Love due to his repeated violations of Wayfair's attendance policy.

Presently before the Court are two motions: Wayfair's Motion for Summary Judgment (ECF No. 29), which seeks summary judgment on all four claims and is fully briefed (ECF Nos. 34; 41); and Love's Motion to Strike the Declaration of Shellie Weber and Exhibits (ECF No. 36), which is also fully briefed (ECF No. 37). The parties' submissions have been reviewed, and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2025). For the following reasons, (1) Love's Motion to Strike the Declaration of Shellie Weber and Exhibits (ECF No. 36) is DENIED; and (2) Wayfair's Motion for Summary Judgment (ECF No. 29) is GRANTED. Simply stated, no reasonable jury could find for Love on the evidence so viewed, thus Wayfair is entitled to judgment as a matter of law.

## BACKGROUND

### I.    Factual Background

In ruling on a motion for summary judgment, this Court considers the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Except as otherwise noted, the factual background below is based on the materials submitted by the parties with respect to the pending summary judgment motion. In support of its Motion for Summary Judgment (ECF No. 29), Wayfair submitted a one hundred and twenty-four (124) paragraph "Statement of Material Facts as to which There Is No Genuine Dispute" (ECF No. 29-3), which draws from the following four exhibits and

subexhibits included therein: "Exhibit A: Deposition Excerpts of Landrie Love and Exhibits" (ECF No. 29-3); "Exhibit B: Deposition Excerpts of Meriam Sunday and Exhibits" (ECF No. 29-4); "Exhibit C: Declaration of Shellie Weber and Exhibits" (ECF No. 29-5);[3] and "Exhibit D: Excerpts of Subpoena Response from Excelsia Injury Care" (ECF No. 29-6). With its opposition (ECF No. 34), Love submitted the following: the deposition of Meriam Sunday (ECF No. 34-2); an email chain between Wayfair employees Javon Williams ("Williams") and Meriam Sunday ("Sunday") dated February 23, 2023 (ECF No. 34-3; ECF No. 34-4); Wayfair's "Termination Report" and "Final Written Warning" issued to Plaintiff (ECF No. 34-5); Love's time sheets from November 21, 2022 to February 23, 2023 (ECF No. 34-6); an email exchange between Love and Wayfair's Workday account dated March 3, 2023 (ECF No. 34-7); and an email from Javon Williams to Meriam Sunday and Grant Lee ("Lee")—another Wayfair employee—dated February 24, 2023 (ECF No. 34-8). While Plaintiff's opposition relies heavily—perhaps even primarily—on his own deposition testimony (ECF No. 34 at ¶¶ 1, 8–10, 12–15, 17–20, 24–27, 29–31, 33, 39–41), as well as the medical records from Patient First (*id.* ¶¶ 17, 29), he failed to submit such evidence to the Court. And while Wayfair submitted excerpts of Love's deposition testimony (ECF No. 29-3) and the medical records from Patient First (ECF No. 29-3 at 111–17; ECF No. 29-4 at 81–85), several of the portions cited by Plaintiff from his deposition testimony do not appear therein. That is, Plaintiff failed to submit such cites for this Court's consideration of the summary judgment motion. The Court indicates such occurrences below.

---

[3] While Plaintiff moved to strike the declaration of Shellie Weber (ECF No. 36), the Court DENIES Love's Motion to Strike (ECF No. 36) for the reasons set forth in Section I of the Court's Analysis.

### A.  General Background on Love's Employment at Wayfair

On November 14, 2022, Wayfair hired Love to work as a Warehouse Associate in the Company's warehouse located in Aberdeen, Maryland.  (ECF No. 29-3 at 6:4–6, 7:13–16, 14:11–13, 105–07.)  While he was initially hired to work in Wayfair's Receiving Department, (*id.* at 105–07), Love was transferred to the Bulk Department in January 2023, where he operated a forklift and was supervised by Operations Manager Javon Williams, (*id.* at 9:2–7, 108; ECF No. 29-4 at 12:8–16, 21:19–22:7).  Love worked the "morning shift"—i.e., from 4:30 PM to 3:00 AM—on Wednesday, Thursday, Friday, and Saturday.  (ECF No. 29-3 at 7:17–8:3, 26:15–21.)

### B.  Wayfair's Relevant Attendance Policy and Termination Procedures

Some background on Wayfair's policies and procedures is necessary before addressing the series of events giving rise to the instant litigation.  During the period Defendant employed Plaintiff, Wayfair had an attendance policy that reflected the Company's "expect[ation] [that] each employee [would] be punctual and report to work at their scheduled times, to work their full scheduled shi[f]ts, to arrive on time, and to return from rest breaks and meal periods as scheduled."  (ECF No. 29-5 ¶ 3.)  This attendance policy involved assigning "[a]bsence attendance points" for "any unplanned absence, tardy, early departure, and No Call/No Show ('NCNS') without regard to reason."  (*Id.* ¶¶ 4–11.)  Wayfair's attendance policy "provided that an employee must call in one (1) hour before the start of their shift if they were unable to report for their shift."  (*Id.*)  Where an employee failed to call in one hour before the start of a scheduled shift, it was considered a No Call/No Show ("NCNS") resulting in the assessment of points, regardless of the reason for the employee's absence.  (*Id.*)  Accruing more than three

NCNS or other violations of the attendance policy in a six month period was grounds for termination. (*Id.* ¶ 12.) The Company advises employees of its attendance policy "during the application process and upon hire." (*Id.* ¶ 13.)

With respect to Wayfair's termination procedures, managers—like Williams—were permitted to make recommendations for termination for employees under their supervision. (ECF No. 29-4 at 11:17–12:1.) After an employee was recommended for termination, the termination request was assigned to a human resources manager—who did not have the power to recommend employees for termination—to review, investigate, and ultimately approve or deny the termination request. (*Id.* at 11:3–17:8.) While the parties dispute whether the assigned human resources manager was required to speak with the employee prior to any disciplinary action, (ECF No. 34 at 1–4; ECF No. 41 at 15–16), Love's claim that Wayfair required a manager to meet with the employee prior to any discipline is not—as Plaintiff claims—supported by the record, (ECF No. 29-4 at 23–26), nor is this "disputed" fact material to any of Plaintiff's claims.

### C. The February 16, 2023 Workplace Incident Involving Love

With respect to the events giving rise to the instant litigation, approximately two hours into his shift on Thursday, February 16, 2023, Love drove a forklift into a pylon. (ECF No. 29-3 at 15:16–23:25; ECF No. 29-4 at 29:9–39:15.) While Love did not lose consciousness, he hit his head on the cage of the forklift and cut his lip.[4] (ECF No. 29-3 at 20:2–21:3, 108,

---

[4] At some point after the February 16, 2023 incident, Love began physical therapy for neck pain. (ECF No. 29-6 at 25.) Love allegedly testified during his deposition in 2024 that he was required to attend physical therapy three times a week since the accident, (ECF No. 34 at 6); however, the cited portion of his deposition was not submitted to the Court. The Court finds it prudent to note that an assessment from OrthoMaryland suggests that as of August 30, 2023, further physical therapy was unnecessary. (ECF No. 29-6 at 25.)

109, 111–17; ECF No. 29-4 at 30:19–31:2, 58:7–11; ECF No. 29-6 at 19–20, 22, 24.)  Love refused medical treatment, and completed an "Employee Report" and signed a "Refusal of Medical Treatment" form.  (ECF No. 29-3 at 108–09.)  Love apparently testified during his deposition that Williams advised him that he would be fired if he filed a workers' compensation claim, though the cited portion of the Love's deposition was not submitted to the Court.  (ECF No. 34 at 1, 4–5.)  Essentially, Love suggests that his supervisor's advisement caused him to report that he was okay when he was not okay, but once again, the cited portion of Love's deposition was not submitted to the Court.  (*Id.* at 5.)

### D. Love's First Visit to the Emergency Room at Mercy on February 17, 2023

In the early afternoon on Friday, February 17, 2023, Love went to the emergency room at Mercy Medical Center in Baltimore, Maryland.[5]  (ECF No. 29-6 at 19–22.)  He denied headaches, loss of consciousness, and "any other systemic complaints," and the laceration on his lip—the focus of this visit—did not require suturing.  (*Id.*)  Mercy provided Love with a "Work/School Note" that stated he "should return to work or school in 1–2 days."  (ECF No. 29-3 at 110; ECF No. 29-4 at 80.)

### E. Love's Absences on February 17 and 18, 2023

While Love was scheduled to work on Friday, February 17 and Saturday, February 18, 2023, he did not report for his shifts.  (ECF No. 29-3 at 230:2–231:20; ECF No. 29-4 at 48:8–13, 75.)  Love was deemed a No Call/No Show for both days.  (ECF No. 29-3 at 36:11–20; ECF No. 29-4 at 45:1–51:16, 76–77; ECF No. 29-5 at 4 ¶ 22, 6–7, 14.)  In his

---

[5] Plaintiff suggests that he went to Patient First before going to Mercy, and Patient First told him that they would not treat him without him first filing for workers' compensation.  (ECF No. 34 at 5–6.)  Again, the cited portion of his deposition was not submitted to the Court.

opposition, Love suggests that he *might* have complied with Wayfair's attendance policy prior to his absences on February 17 and 18, 2023, though he continues to cite portions of his deposition testimony not submitted to the Court. (ECF No. 34 at 6–7.) According to Love, he testified at his deposition that he called Williams on February 17 "around 4:00, maybe . . . 3:00," and that he further communicated such absences with Human Resources Manager Meriam Sunday, though he provides no detail as to when he allegedly did so. (*Id.*) Love further suggests that an email from Williams to Sunday dated February 23, 2023, and Sunday's deposition testimony that she remembered Love's absences, corroborate his claim of possible compliance. (*Id.* (citing ECF No. 34-2 at 16; ECF No. 34-3 at 1).) While this Court does not make credibility determinations in considering a summary judgment motion, the Court finds it prudent to note that neither the aforementioned email nor Sunday's deposition testimony support Love's contention that he *might* have complied with Wayfair's attendance policy prior to his absence on February 17, 2023. Moreover, the Court emphasizes that the excerpts of Love's deposition testimony that were submitted to the Court demonstrate that Love testified that he did not remember contacting anyone at Wayfair to inform them of his absence. (ECF No. 29-3 at 35:9–36:20.)

### F.  Love's Return to Work on February 22, 2023 and Assignment to Receiving

When Love returned to work on Wednesday, February 22, 2023, he asked Williams if he could drive the forklift. (ECF No. 29-5 at 13, 16–17.) Williams advised Love he would not be driving and had to return to Wayfair's Receiving Department until the investigation into the February 16 incident was over. (ECF No. 29-5 at 16.) Love allegedly threatened to quit if he had to stay in Receiving permanently. (*Id.*)

**G. Love Leaves Early on February 23, 2023**

On Thursday, February 23, 2023, Love again asked if he could drive the forklift, and Williams again answered that he would need to work in Receiving until the investigation was over. (ECF No. 29-5 at 16.) Again, Love allegedly threatened to quit if he had to work in receiving. (*Id.*)

Later that day, Love asked Grant Lee, the Site Director of Wayfair's Aberdeen warehouse, whether he would lose his pay differential for operating the forklift as a result of not being able to work in Bulk. (*Id.* at 13.) After Lee confirmed that he would lose this "SEO pay," Love advised that he was quitting and walked off the job.[6] (*Id.*; ECF No. 29-4 at 76–77.) Love testified that he asked Lee if he could go to the doctor's because he was not feeling well and Lee told him to go ahead, (ECF No. 34 at 7–8; ECF No. 29-3 at 60), though some of the portions of his deposition that Love cites to were not submitted to the Court.

**H. Wayfair's Final Written Warning Issued to Love on February 23, 2023**

In light of his NCNS recorded absences on February 16 and 17, 2023, and early departure on February 23, 2023, Wayfair issued Love a "Final Written Warning" on February 23, 2023. (ECF No. 29-4 at 76–77, 85; ECF No. 29-5 at 4 ¶ 16, 18.) The warning advised that "Any further attendance occurrences including any unplanned tardy, early departure, absence, and/or No Call No Show . . . may result in further disciplinary action up to and including termination." (ECF No. 29-4 at 77.) While Love complains that he "never knew about the Final Written Warning," (ECF No. 34 at 9–10), this is of no import—as Love

---

[6] Plaintiff suggests that he told Lee that Wayfair "did not uphold its end of the bargain . . . after [he] 'agreed' not to file for workers['] compensation," and that Lee told him he would have to "go back to $19/hour." (ECF No. 34 at 7–8.) Again, the cited portion of his deposition was not submitted to the Court.

"was not required to respond to or acknowledge the electronic notification that he received [the warning] for it to be effective." (ECF No. 29-5 at 4 ¶ 21.)

### I. Love's Second Visit to the Emergency Room at Mercy on February 23, 2023

Sometime after leaving work early on Thursday, February 23, 2023, Love returned to the emergency room at Mercy Medical Center in Baltimore, Maryland. (ECF No. 29-6 at 4–18.) Love "stated he was seen [at Mercy] 1 week ago with a head injury he s[t]ated concussion and told he could go back to work in two days" and indicated that he "ha[d] been having a headache on and off since." (*Id.* at 4.) Medical records indicate that Love requested imaging and that Mercy performed a CT scan, but Love left before providers could review the results of the scan, which was unremarkable and found no acute cranial abnormality. (*Id.* at 5–6.)

### J. Love's Absence on February 24, 2023

While Love was scheduled to work on Friday, February 24, 2023, he did not report for his shift, and because he failed to advise Wayfair that he would not be reporting to work in accordance with the Company's attendance policy, he was deemed a No Call/No Show. (ECF No. 29-5 at 4 ¶ 22, 13, 15.) At 4:48 PM, Williams recommended Love's employment be terminated, citing Love's various attendance policy violations as the reason for the request. (ECF No. 29-4 at 78.) Meriam Sunday ("Sunday"), a Human Resources Manager for Wayfair's Aberdeen warehouse, was assigned to investigate the request. (*Id.*) In brief, Sunday confirmed that Love had No Call No Showed on February 17, 18, and 24, 2023, and that such absences violated the Company's attendance policy. (*Id.* at 18:2–20:2.) Sunday spoke to Love at approximately 6:44 PM on February 24, 2023, (*id.* at 18:2–20:2, 54:15–55:16), who confirmed that he did not comply with the Company's attendance policy on

February 17, 18, and 24, 2023, but claimed he thought he did not have to do so in light of the February 16, 2023 incident, (*id.* at 78).  Sunday denies that Love discussed "light duty opportunity" with her, but notes that Love asked her about workers' compensation and she advised him that she would facilitate forwarding the documents Love sent her to the appropriate contacts and provided Love with contact information.  (*Id.* at 56:6–59:20, 62:21–63:20, 67:3–69:14.)

Rather than report to work on Friday, February 24, 2023, at approximately 6:00 PM—over an hour after Williams recommended his termination—Love presented at Patient First of Bayview in Baltimore, Maryland.  (ECF No. 29-3 at 111–17; ECF No. 29-4 at 81–85.)  The Patient First of Bayview medical records provide the following: "Diagnosis(es): Concussion without loss of consciousness, initial encounter."  (ECF No. 29-4 at 81.)

**K.  Love's Termination on March 1, 2023**

Love called out sick on February 25 and March 1, 2023.  (ECF No. 29-3 at 69:16–71:22; ECF No. 29-4 at 85; ECF No. 29-5 at 4 ¶ 22, 15.)  Ultimately, Love was terminated on March 1, 2023.[7]  (ECF No. 29-3 at 72:19–74:22, 118–19; ECF No. 29-5 at 4 ¶ 22, 8–9.)

**II.  Procedural History**

On September 27, 2023, Love initiated the instant litigation,[8] advancing four claims

---

[7] While the parties dispute when the termination was communicated with Plaintiff—with Wayfair submitting documentation to support their claim that Love was notified via phone call from Sunday on March 1, 2023 (ECF No. 29-3 at 72:19–74:22, 118–19; ECF No. 29-4 at 71:17–72:8) and Plaintiff claiming he was terminated via email on March 3, 2023 (ECF No. 34 at 10–11), though once again, some of the portions cited by Plaintiff were not submitted to the Court—this fact is immaterial to the Plaintiff's claims.

[8] Before filing an ADA action in federal court, a plaintiff must timely file charges of employment discrimination with the Equal Employment Opportunity Commission ("EEOC").  Plaintiff's Complaint alleges that at some unspecified point, Plaintiff "exhausted all administrative remedies with the Equal Employment Opportunity Commission and is in possession of a Notice of Right to Sue."  (ECF No. 1 ¶ 6.)

against Wayfair. (ECF No. 1.) Specifically, Love advances three federal claims under the Americans with Disability Act, 42 U.S.C. §§ 12101–12213—a claim for discrimination (Claim One), a claim for retaliation (Claim Two), and a claim for failure to accommodate (Claim Three)—as well as a state claim for wrongful termination wherein Love claims he was fired in retaliation for his filing of a workers' compensation claim in violation of MD. CODE, LAB. & EMPL. § 9-1105 (Claim Four). On November 16, 2023, Wayfair filed its Answer (ECF No. 14), and this matter proceeded to discovery, which has now concluded, (ECF No. 28). Presently before the Court are two motions: (1) Wayfair's Motion for Summary Judgment (ECF No. 29), which is fully briefed (ECF Nos. 34; 41); and (2) Love's Motion to Strike the Declaration of Shellie Weber and Exhibits (ECF No. 36), which is fully briefed (ECF No. 37).

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial. *Id.* at 249. Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually

unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)). This Court has previously explained that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala*, 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted). Stated differently, "a factual dispute is genuine only where 'the non-movant's version is supported by sufficient evidence to permit a reasonable jury to find' in its favor." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015) (quoting *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 175 (4th Cir. 1988)).

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). This Court "must not weigh evidence or make credibility determinations." *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)). Indeed, it is the function of the fact-finder to resolve factual disputes, including issues of witness credibility. *See Tolan v. Cotton*, 572 U.S. 650, 656–60 (2014).

## ANALYSIS

The Court addresses Love's Motion to Strike the Declaration of Shellie Weber and Exhibits (ECF No. 36) before addressing Wayfair's Motion for Summary Judgment (ECF No. 29).

### I.    Motion to Strike

Through his motion (ECF No. 36), Love moves to strike the declaration of Shellie

Weber ("Weber") submitted by Wayfair in support of its summary judgment motion.  As background, Weber is a Senior Talent Manager at Wayfair, and her declaration contains background information on Wayfair's policies and procedure, as well as the final written warning issued to Love and other relevant documents maintained by Wayfair.  (ECF No. 29-5.) According to Plaintiff, Wayfair "never disclosed [Weber] and doing so now is highly prejudicial to Plaintiff and his ability to refute any of the statements made by Weber."  (*Id.* at 1.)  In response, Defendant notes: (1) that the parties did not exchange Rule 26(a)(1) disclosures pursuant to the Court's November 16, 2023 scheduling order, (ECF No. 38 at 2 (citing ECF No. 15 (noting "[t]his is an action in which Fed. R. Civ. P. 26(a)(1) disclosures need not be made"))); (2) that Weber verified both Wayfair's Objections and Answers to Plaintiff's First Set of Interrogatories served March 19, 2024, as well as its Objections and Answers to Plaintiff's Second Set of Interrogatories served July 15, 2024, (*id.* (citing ECF No. 38-1 at 15; ECF No. 38-2 at 7)); and (3) that, during her August 8, 2024 deposition, Sunday testified that Weber was her supervisor, (*id.*; *see also* ECF No. 34-2 at 5).

In general, Federal Rule of Civil Procedure 26(a)(1)(A)(i) requires a party to provide to the other parties: "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment."  However, as Wayfair correctly notes, (ECF No. 38 at 2), this Court's initial scheduling order dated November 16, 2023 provided that this was a case in which initial disclosures need not be made (ECF No. 15 at 2).  Nevertheless, parties have a continuing duty to supplement or correct all Rule 26(a) disclosures, interrogatory responses,

and requests for production if their responses are either incomplete or incorrect, "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." FED. R. CIV. P. 26(e)(1).  Rule 37 states that a party who fails to provide information or identify witnesses as required under Rule 26(a) or fails to supplement as required under Rule 26(e)(1) "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1).

Love's invocation of Fed. R. Civ. P. 37(c)(1) is unavailing.  In short, Love had notice of Weber's knowledge of Wayfair's policies, procedures, and documents based on the March 19, 2024 and July 15, 2024 interrogatory responses and verifications, as well as Sunday's deposition testimony that Weber was her supervisor.  Thus, Love's Motion (ECF No. 36) seeking to strike Weber's declaration based on the failure to disclose is DENIED.

## II.    Motion for Summary Judgment

Love's Complaint consists of four causes of action: three federal claims under the Americans with Disability Act, 42 U.S.C. §§ 12101–12213—a claim for discrimination (Claim One), a claim for retaliation (Claim Two), and a claim for failure to accommodate (Claim Three)—as well as a state claim for wrongful termination in retaliation for filing a workers' compensation claim in violation of MD. CODE, LAB. & EMPL. § 9-1105 (Claim Four).  (ECF No. 1.)  Wayfair moves for summary judgment on all four claims.  (ECF No. 29.)  The Court will discuss Love's federal claims (Claims One, Two, and Three) before turning to discuss the state claim (Claim Four).

### A. Love's Claims Under the Americans with Disabilities Act

Love claims that Wayfair (1) discriminated against him in violation of the ADA by terminating his employment due to disability (Claim One); (2) retaliated against him in violation of the ADA by terminating his employment after he requested reasonable accommodations (Claim Two); and (3) failed to provide him with reasonable accommodations (Claim Three).

### 1. Claim One: Discrimination

The Americans with Disability Act prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges or employment." 42 U.S.C. § 12112(a). To survive summary judgment for an ADA discrimination claim, a plaintiff is required to provide evidence sufficient to demonstrate: "(1) that []he has a disability, (2) that []he is a 'qualified individual' for the employment in question, and (3) that [his employer] discharged h[im] (or took other adverse employment action) because of h[is] disability." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 572 (4th Cir. 2015) (quoting *EEOC v. Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 377 (4th Cir. 2000)).

Disability discrimination may be proven through direct and indirect evidence or through the *McDonnell Douglas* burden-shifting framework.[9] *Id.* (citing *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49–50 (2003)). Under the *McDonnell Douglas* framework, a plaintiff must first make out a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

---

[9]  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

802–05 (1973).  The burden then shifts to the employer, who must establish that there was "a legitimate, nondiscriminatory reason" for the adverse employment action.  *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981).  "This burden is one of production, not persuasion; it can involve no credibility assessment."  *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 142 (2000).  If the employer meets its burden, the plaintiff must then "prove by a preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination."  *Id* at 143 (quotations and citations omitted).  Importantly, "[t]he ultimate burden of persuading the trier of fact that the [employer] intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Burdine*, 450 U.S. at 253.

    **i.  Whether Love had a disability.**

As noted, an ADA disability discrimination is analyzed under the *McDonnell Douglas* burden-shifting framework.  To establish a prima facie case, Love must demonstrate, among other things, that he is disabled within the meaning of the ADA.  *Jacobs*, 780 F.3d at 572.  Wayfair contends that Love has failed to satisfy that burden.  (ECF No. 29-1 at 16–19; ECF No. 41 at 9–12.)

Under the ADA, a disability means:

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment[.]

42 U.S.C. § 12102(1)(A)–(C).[10]  Here, Love insists he was actually disabled under 42 U.S.C. § 12102(1)(A).

A physical impairment includes "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine[.]" 29 C.F.R. § 1630.2(h)(1).  "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A).  The ADA's implementing regulations state that an impairment constitutes a disability if it "substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii).  The regulations provide that "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting."[11]  *Id.*  While whether an employee

---

[10]  While Love does not claim to be disabled under 42 U.S.C. § 12102(1)(B) or (C), the Court finds it prudent to note that Love would not prevail under either definition.  With respect to § 12102(1)(B), "record of" means that the individual has a history of, or has been misclassified as having a mental or physical impairment that substantially limits one or more major life activities, even though the person does not have a current disability. 29 C.F.R. § 1630.2(k).  No such claim is advanced here.  With respect to § 12102(1)(C), "regarded as" means someone has an actual or perceived impairment that is not transitory or minor—i.e., an impairment "with an actual or expected duration of 6 months or less." 42 U.S.C.§ 12102(3)(B).  Love's impairment was exactly that, (ECF No. 29-3 at 110, 114; ECF No. 29-6 at 25), and such a condition precludes Love from proving he was "regarded as" having a disability.  Moreover, Plaintiff presents no evidence to show that Wayfair perceived him to be impaired.  While it is not Wayfair's burden to prove the absence of a perception of disability, Wayfair's lack of knowledge and perception is reflected in its repeated efforts to get Love to return to work or properly comply with the Company's attendance policy.

[11]  The Court notes that this standard is more lenient than the previous ADA standard.  Prior to the enactment of the ADA Amendments Act in 2009, the regulations and case law held "'[s]ubstantially' in the phrase 'substantially limits' suggests 'considerable' or 'to a large degree.'" *Toyota Motor Mfg., Ky. v. Williams*, 534 U.S.

had an impairment and whether the conduct affected is a major life activity are questions of law, whether the impairment substantially limits the major life activity is a question of fact. *Thomas v. City of Annapolis*, 851 F. App'x 341, 349 (4th Cir. 2021); *J.D. by Doherty v. Colonial Williamsburg Found.*, 925 F.3d 663, 671 (4th Cir. 2019).

Love's claimed impairment is a concussion[12] that he claims resulted in headaches, neck pain, sensitivity to sunlight and disruptions to his general functioning (i.e., "his ability to work, sleep, think").  (ECF No. 34 at 12.)  To support this claim that his impairment "substantially limit[ed]" "his ability to work, sleep, think"[13] "as compared to most people in the general population"—that is, that he was actually disabled under 42 U.S.C. § 12102(1)(A)—Love exclusively relies on his own deposition testimony and the record from his visit to Patient First on February 24, 2023.

Preliminarily, the Court observes that the medical records submitted to the Court do not advance Love's argument that his claimed impairment substantially limited a major life activity.  The Court first notes that the medical records from Love's earlier visits to Mercy Medical Center (ECF No. 29-6 at 4–22) tend to negate Plaintiff's claim that such impairments substantially limited one or more major life activities at the time he was fired.  Beginning with his visit to the emergency room on February 17, 2023, Love told providers at Mercy that he did not have a headache, and treatment records suggest that this first visit focused not on the

---

184, 198 (2002) (quoting *Substantially*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1970)).  Courts also considered factors such as "the nature and severity of the impairment; the duration or expected duration of the impairment; and the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the impairment."  *Id.* at 196 (alterations and quotation marks omitted).

[12] While Love also emphasizes the laceration on his lip, it is implausible based on the record before the Court that the cut substantially limited one or more of Love's major life activities.

[13] The Court recognizes that all three of these affected functions are considered major life activities.  42 U.S.C. § 12102(2)(A).

alleged head injury, but on the laceration on his lip and whether it required suturing. (*Id.* at 19–22.) When Love returned to the same emergency room on February 23, 2023, he told providers at Mercy that he was experiencing headaches on and off since the incident but denied photophobia and trouble sleeping. (*Id.* at 4–18.) While records from this visit mention a concussion, the records do not show that providers diagnosed Love with a concussion, but rather that Love informed providers that he was previously seen at Mercy for a concussion during his February 17, 2023 visit. (*Id.* at 7 (noting Love "stated he was seen here 1 week ago with a head injury he sated [sic] concussion and told he could go back to work in two days").) A review of the record from his February 16, 2023 emergency room visit indicates that no such diagnosis was made. (*Id.* at 19–22.) And while the record from Love's visit to Patient First on February 24, 2023 shows that Love was diagnosed with a concussion, the record suggests that providers at Patient First told Love he could likely "Return to Play"—i.e., resume normal activities, in five to six days. (ECF No. 29-3 at 111–17; ECF No. 29-4 at 81–85.) These records do not demonstrate that Love's alleged concussion and resulting headaches "substantially limit[ed] [his] ability to [work, sleep, think] as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii).

Love attempts to fill such deficiencies in the medical record through his own lay testimony.[14] Love testified about difficulty working, sleeping, and thinking. (ECF No. 29-3

---

[14] The Fourth Circuit has observed that "courts have long ago buried—or at least tried to bury—the misconception that uncorroborated testimony from the non-movant cannot prevent summary judgment because it is self-serving." *Lovett v. Cracker Barrel Old Country Store, Inc.,* 700 F. App'x 209, 212 (4th Cir. 2017) (internal citations omitted). "Rather, if such an affidavit is based on personal knowledge or firsthand experience, such testimony can be evidence of disputed material facts." *Id.* (citation omitted). "The key question remains whether the non-movant has produced enough evidence to demonstrate that a 'dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the

at 43:1–46:14, 57:5–58:20, 79:2–82:22.)    During his deposition on April 8, 2024, Love complained that he "can't work long and hard times the—the way I was working" and further explained that "10 hours on my feet going up in the air like these dizziness and headaches is not a game" and that he did not feel safe doing that type of work anymore.  (*Id.* at 43:1–18.) He explained he was not "100 percent recovered," and that he was "not . . . trying to do any labor work at all ever again" and would prefer "to go into . . . restaurant[s] or do something like that."  (*Id.* at 43:19–44:4.)  He explained that the incident "traumatized" him and noted the "headaches and dizziness."  (*Id.* at 44:4–45:3.)  He testified that he did not historically have trouble sleeping but had difficulty sleeping since the accident, and explained that while he now had medication that "knocks [him] right out," he had previously experienced restlessness until "4:00, 5:00 in the morning."  (*Id.* at 45:4–46:14.)  During his deposition on May 20, 2024, Love testified that he had a "crazy headache," "got dizzy," and experienced blurry vision and neck pain on his drive to work on February 22, 2023, but decided to "overlook" his injuries to keep his job.  (*Id.* at 57:5–58:20.)    The Court highlights the following excerpt from Love's May 20, 2024 deposition:

> Q: [The Complaint] says the concussion substantially impaired or limited [your] ability to perform manual tasks or work, thinking, and sleeping; did I read that right?
>
> A: Yes.
>
> Q: Okay.  So my question is: What does that mean to you?
>
> A: That my concussion was—was severe.  It was, you know, something that at any given time, you know, it can affect my ability to do my job, that these, you know, headaches were coming, and they were coming strong with dizziness.

---

nonmoving party.'"  *Id.* (citing *Anderson*, 477 U.S. at 248).  Sometimes, such testimony will be insufficient to meet this standard, other times it will be enough.  *Id.* (citations omitted).

Q: How did your concussion impair or limit your ability to think?

A: Oh, my God. My headaches, they—they impaired my, like, literally, some days, I'd just have to go and lay down, like, take a Motrin, Tylenol, whatever I can get to literally just go to sleep.  Them headaches were killing me.

Q: Did you take any other medications besides Motrin or Tylenol or anything like that?

A: No.  And then I start—I got—got a prescription because I'm, like, Look, the headaches are really, really getting bad.  And that's when the doctor prescribed me and that's when things start getting better.  I can control the headaches.

. . .

Q: When—when you didn't have a headache, when the headache cleared up, were you able to think clearly?

A: Yes.

. . .

Q: Tell me how the concussion impaired or limited your ability to sleep?

A: A lot.  I—I had to take one of the medications are for at nighttime to help me sleep.

Q: Okay.

A: Yes.  So I was really having a tough time sleeping. My neck, just I don't know what pillows.  I switched from feather pillows to, I mean, the foam pillows. It was just not, I'm like, this is not doing it.  Literally, I would have to have no pillow to actually feel a little comfort, like, because the pillows would just have me in positions that and I just couldn't sleep at all.

Q: And was—was your inability to sleep because of your headaches or your neck pain or something?

A: Sometimes the headaches and the neck pains, yes.  Sometimes the headaches.

Q: And when you took medicine, were you able to sleep?

A: Yes.

Q: How long did you not have medicine?

> A: Maybe about two months—two months in.  And I'm, like, I was going through physical therapy, and I'm, like, the therapy is working, like, you know, but I'm still getting these headaches like crazy and then the sunlight, it was summertime, so it was just like really drive me up the wall.

(*Id.* at 79:2–82:22.)  Such statements—without more—do not establish a substantial limitation, especially where such claims are so sparsely supported—and often contradicted—by medical records.  In *Anderson v. Diamondback Inv. Grp., LLC*, 117 F.4th 165, 175–77 (4th Cir. 2024), the Fourth Circuit expressed similar skepticism towards a plaintiff claiming disability discrimination who similarly relied on her own layperson testimony to put the issue of disability in dispute, though the Fourth Circuit affirmed the district court's grant of summary judgment without deciding that the plaintiff adequately discharged her burden to establish that she was an individual with a disability as defined by the ADA.  At bottom, viewing the record in the light most favorable to Love, no reasonable jury could find that Love was substantially impaired in the major life activities of working, sleeping, and thinking at the time he was fired.  And even if he could, Love cannot establish the burden on the remaining elements of his ADA discrimination claim, as discussed below.

ii.  **Whether Love has shown that he was a qualified individual for the employment in question.**

The Court turns to the second element of the prima facie case: whether Love has presented any evidence that he was a qualified individual for the employment in question.  The ADA prohibits employers "from discriminating against a qualified individual on the basis of disability."  *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 344 (4th Cir. 2013) (alteration adopted and internal citation omitted).  "The ADA defines a qualified individual as an individual who, with or without reasonable accommodation, can perform the essential functions of the

employment position that such individual holds or desires." *Jessup v. Barnes Grp., Inc.*, 23 F.4th 360, 365 (4th Cir. 2022) (internal quotation marks omitted).  The Fourth Circuit has explained that "[a]n employee who cannot meet the attendance requirements of the job at issue cannot be considered a qualified individual protected by the ADA." *Tyndall v. Nat'l Educ. Ctrs. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994).  In *Tyndall*, the Fourth Circuit further explained that "[e]xcept in the unusual case where an employee can effectively perform all work-related duties at home, an employee who does not come to work cannot perform any of his job functions, essential or otherwise." *Id.* (internal quotation marks omitted.)

Here, Wayfair emphasizes Love's repeated attendance issues to argue that no reasonable jury could find that, at the time of his termination, Plaintiff was performing his job at a level that met Wayfair's legitimate expectations, emphasizing Love's absences on February 17, February 18,  and  February 24, 2023—despite the Company's final written warning on February 23, 2023—as well as his walking off the job early on February 23, 2023. (ECF No. 29-1 at 19–20.)  Love contends that he followed the attendance policy, suggesting he called Williams to advise him of his absences on February 17 and 18, 2023, and that he further called Sunday to advise her of the same, though he makes no mention as to when he contacted Sunday.  (ECF No. 34 at 12–13.)  He further claims that he left work early on February 23, 2023 to go to the doctor with Lee's permission.  (*Id.* at 13.)

Preliminarily, the Court finds that there can be no genuine dispute that regular attendance is an essential function of Love's job as a warehouse associate at Wayfair. *Tyndall*, 31 F.3d at 213.  This is evidenced by the Company's policy requiring employees to call in one hour before the start of a scheduled shift and to work their full scheduled shifts.  (ECF No.

29-5 ¶¶ 3–13.)

To demonstrate that he was meeting this expectation, Love relies on his own testimony. As noted, at best, Love's testimony suggests that he *might* have complied with Wayfair's attendance policy prior to his absences on February 17 and 18, 2023.  (ECF No. 34 at 6–7.) Pursuant to Wayfair's policy, Love was required to call in no later than an hour before his scheduled shift—i.e., by 3:30 PM, as his workday started at 4:30 PM.  During his deposition on April 8, 2024, Love testified that he called Williams on February 17 "around 4:00, maybe . . . 3:00," though Love failed to provide the cited excerpt to the Court, and excerpts of Love's deposition testimony that were submitted to the Court demonstrate that Love testified that he did not remember contacting anyone at Wayfair to inform them of his absence on February 17 and 18, 2023.  (ECF No. 29-3 at 35:9–36:20 (responding "I don't remember" and "I might have" when asked "[d]id you contact anyone at Wayfair to tell them that you were not going to work [on February 17, 2023]?").)  In short, aside from Love's claim that he *might* have complied with Wayfair's attendance policy prior to his absences on February 17 and 18, 2023, the evidence before this Court suggests that Love did not comply with the Company's attendance policy on several occasions.  (ECF No. 29-5 at 16 (email from Williams to Sunday and Lee stating that Love NCNS on February 17 and 18, 2023).)

While this Court does not make credibility determinations in considering a summary judgment motion, viewing the record in the light most favorable to Love, no reasonable jury could find that Love was a qualified individual for the employment in question.  And even if he could, he cannot meet his burden on the other elements of his ADA discrimination claim, as discussed above (disability) and below (causation).

iii.    **Whether Love has demonstrated causation.**

The third element of the prima facie case is causation, and in the ADA context, the Fourth Circuit has held that proving discrimination "on the basis of" disability "requires only that the disability was 'a motivating cause' of" Wayfair's decision.  *Halpern v. Wake Forest. Univ. Health Scis.*, 669 F.3d 454, 462 (4th Cir. 2012).  Thus, while "the ADA's causation element can be satisfied by proof that disability was 'a' motivating factor (rather than the 'sole' reason) for the defendant's decision, to establish causation more is required than '[t]he fact that [the defendant] is aware of [the plaintiff's] impairment.'"  *Neal v. E. Carolina Univ.*, 53 F.4th 130, 150 (4th Cir. 2022) (quoting *Haulbrook v. .Michelin N. Am., Inc.*, 252 F.3d 696, 703 (4th Cir. 2001)); *see also Gentry v. E. W. Partners Club Mgmt. Co. Inc.*, 816 F.3d 228, 235 (4th Cir. 2016) (holding that to demonstrate discrimination under the ADA a plaintiff must meet the "but-for" standard of causation).  Instead, "a plaintiff must show that the adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination."  *Id.* (quoting *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 380 (4th Cir. 2022)).

Here, Plaintiff has wholly failed to suggest that Williams—the individual who recommended Love's termination at 4:48 PM on February 24, 2023—or Sunday—the individual who investigated and ultimately approved Love's termination—possessed discriminatory animus linked to Plaintiff's claimed disability.[15]  He further adduces no evidence that would permit an inference of but-for causation, such as disparate treatment afforded to a non-disabled employee with a similar attendance record.  Given the distinct lack of

---

[15] Wayfair raises several challenges to the causation element as to Claim One.  (ECF No. 29-1 at 20–23.)  Love's opposition does not meaningfully respond to any of Defendant's arguments.

discriminatory animus on behalf of the decisionmakers, as well as the lack of any similarly situated comparators, but-for causation between Love's claimed disability and his termination cannot be established for the purposes of fulfilling his burden on summary judgment.  Because no reasonable jury could find that Love had a disability, that he was a qualified individual for employment with Wayfair, and that he was terminated because of his disability, summary judgment shall be granted for Wayfair as to Claim One.

iv. **Whether Wayfair has established that there was "a legitimate, nondiscriminatory reason" for Love's termination.**

If the Court were to assume, *arguendo*, that Love could establish a prima facie case of disability discrimination, the burden would then shift to Wayfair to establish "a legitimate, nondiscriminatory reason" for Plaintiff's termination under the burden-shifting framework articulated in *McDonnell Douglas*.  It has.  According to Wayfair, the Company terminated Love for his failure to comply with its attendance policy.  (ECF No. 29-1 at 20.)

v. **Whether Love has sufficiently rebutted Wayfair's proffered legitimate nondiscriminatory reason for his termination.**

Under the burden-shifting framework articulated in *McDonnell Douglas*, Wayfair's proffering of a legitimate, non-discriminatory reason for Love's termination requires Love to offer evidence that by a preponderance of the evidence, the Company's reason is merely a pretext for discrimination.  *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 143 (2000).  In his opposition to the summary judgment motion, Love claims Wayfair's "reasons are false." (ECF No. 34 at 13–15.)  First, Love continues to argue that he "called out directly to [Williams and Sunday] before his shifts on February [17 and 18, 2023]."  (*Id.* at 14.)  As noted above, nothing in the record suggests that Love notified Sunday in compliance with Wayfair's

attendance policy. That is, neither the email from Williams to Sunday dated February 23, 2023, nor Sunday's deposition testimony that she remembered Love's absences, corroborate as much, and Love makes no mention of when he allegedly notified Sunday. (ECF No. 34-2 at 16; ECF No. 34-3 at 1.) Second, and as discussed above, Love suggests that, at best, he *might* have complied with Wayfair's attendance policy prior to his absences on February 17 and 18, 2023 by citing to portions of his deposition testimony not submitted to the Court. (ECF No. 34 at 6–7.) Again, the Court emphasizes that the excerpts of Love's deposition testimony that were submitted to the Court demonstrate that Love testified that he did not remember contacting anyone at Wayfair to inform them of his absence, (ECF No. 29-3 at 35:9–36:20), and evidence in the record suggests that Love repeatedly failed to comply with the Company's attendance policy, (ECF No. 29-5 at 16).

Love further claims that he did not have an unexcused absence on February 23, 2023, but rather that he left early to go to the doctor. (ECF No. 34 at 14.) According to Wayfair, Love advised that he was quitting and walked off the job after a supervisor advised him that he would lose his pay differential for operating the forklift as a result of not being able to operate the forklift. (ECF No. 29-5 at 15.) Regardless of the reason for Love's early departure, Wayfair's attendance policy reflected the Company's expectation that employees would work their full scheduled shifts, among other things. (ECF No. 29-5 ¶ 3.)

Lastly, Love complains—rather confusingly—that Wayfair violated its own policies in issuing the final written warning, insisting that (1) he was not scheduled to work on February 24, 2023; and (2) Wayfair would not take any disciplinary actions until an "in person" meeting with a "witness." (ECF No. 34 at 14–15.) First, the record demonstrates that Love

was scheduled to work on February 24, 2023, but he did not report for his shift, and because he failed to advise Wayfair that he would not be reporting to work in accordance with the Company's attendance policy, he was deemed a No Call/No Show. (ECF No. 29-5 at 4 ¶ 22, 13, 15.) Second, Love's claim that Wayfair required a manager to meet with the employee prior to any discipline is not, as Plaintiff suggests, supported by the record, (ECF No. 29-4 at 23–26), nor is this "disputed" fact material to Plaintiff's claims.

Love's arguments attempting to rebut Wayfair's proffered legitimate nondiscriminatory reason for his termination merely serve to muddy the waters. Again, assuming that Love could make out a prima facie case of discrimination, he has further failed to satisfy his burden to rebut Wayfair's proffered legitimate nondiscriminatory reason for his termination by a preponderance of the evidence.

## 2. Claim Two: Retaliation

The ADA provides that "[n]o person shall discriminate against any individual" for "oppos[ing] any act or practice made unlawful by [the ADA]," 42 U.S.C. § 12203(a), or for "requesting an accommodation" for a disability. *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 577 (4th Cir. 2015). Love claims he was fired because he engaged in protected activity— that is, he claims Wayfair fired him because he requested reasonable accommodation.

In order to prevail on a claim of retaliation, a plaintiff must either offer sufficient direct and indirect evidence of retaliation, or proceed under a burden-shifting method. *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001). Whether a plaintiff proceeds by direct evidence or *McDonnell Douglas* burden-shifting, he must show (i) that he engaged in protected activity and, (ii) because of this, (iii) his employer took an adverse employment action against him. *Id.*

Here, the record contains no evidence that Love was discharged because he requested an accommodation for his claimed disability. At his May 20, 2024 deposition, Love was asked about his allegation that "Wayfair Human Resource acknowledged receipt of the light duty accommodation note recommendation for Love and that it had been forwarded to workers' compensation" on February 24, 2023. (ECF No. 29-3 at 63:21–64:4.) When counsel asked "[w]hat does acknowledged receipt of the light duty accommodation note mean?," Love responded "[m]y doctor's note"—referring to the record from Patient First. (*Id.* at 64:9–11.) When counsel pressed Love for more details, Love explained that he was referring to Sunday, and that he emailed the note and she responded via phone call "the very next morning." (*Id.* at 64:12–65:12.)

The "Initial Visit Report" from Patient First notes Love's visit was dated February 24, 2023, and indicates an "In" time of 6:00 PM, and an "Out" time of 6:29 PM. (ECF No. 29-3 at 111.) The evidence shows that Williams recommended Love's termination at 4:48 PM on February 24, 2023, (ECF No. 29-4 at 78)—i.e., before any purported request for accommodation was made to Sunday. As such, Love fails to present a prima facie case of ADA retaliation.[16] Accordingly, summary judgment shall be granted as to Claim Two.

### 3. Claim Three: Failure to Accommodate

One form of prohibited ADA discrimination is an employer's failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise

---

[16] As with Claim One, if the Court were to assume, *arguendo*, that Love could establish a prima facie case of ADA retaliation, Plaintiff's claim advanced in Claim Three would still fail under the burden-shifting framework articulated in *McDonnell Douglas*. For the reasons set forth above, Wayfair has established that there was a legitimate, nonretaliatory reason for his termination—attendance issues—and Love fails to sufficiently rebut Wayfair's reason as pretext.

qualified individual with a disability who is an . . . employee." 42 U.S.C. § 12112(b)(5)(A).  As defined by the ADA, "reasonable accommodations" can include "(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position . . . appropriate adjustment or modifications of . . . policies . . . and other similar accommodations[.]"  *Id.* § 12111(9).  To survive summary judgment for an ADA failure to accommodate claim, Love must show that (1) that he had a disability within the statutory meaning; (2) that the employer knew of his disability; (3) that a reasonable accommodation would permit him to perform the essential functions of the position; and (4) that the employer refused to make the accommodation.  *Perdue v. Sanofi U.S., LLC*, 999 F.3d 954, 959 (4th Cir. 2021); *see also Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 378 (4th Cir. 2022).

Here, while Wayfair challenges all four elements of Love's ADA failure to accommodate claim, (ECF No. 29-1 at 24–28; ECF No 41 at 9–12), the Court need not repeat its analysis on whether Love has sufficiently demonstrated that he was a qualified individual with a disability within the meaning of the ADA.

### i.  **Whether Wayfair had notice of the disability.**

"The burden to provide notice of a disability is 'not a great one. . . . Adequate notice simply informs the employer of both the disability and the employee's need for the accommodations for that disability.'"  *Rock v. McHugh*, 819 F. Supp. 2d 456, 473 (D. Md. 2011) (quoting *EEOC v. Fed. Express Corp.*, 513 F.3d 360, 369 n.5 (4th Cir. 2008)).  Plaintiff contends that Defendant had notice of his concussion after he forwarded the record from his visit to Patient First on February 24, 2023 to Sunday sometime after the visit.  (ECF No. 34 at 15.)

As outlined above under this Court's Analysis of Love's ADA failure to accommodate claim, the record does not support Plaintiff's theory of notice. Indeed, Plaintiff's own testimony uncontrovertibly establishes that his supervisors—Williams and Lee—and other Wayfair employees like Sunday were not notified that he had a concussion until *after* he was issued a final written warning on February 23, 2023, and *after* Williams recommended Love's termination on February 24, 2023, if ever. Thus, summary judgment shall be granted for Wayfair as to Claim Three.

### ii. Whether Wayfair refused to provide a reasonable accommodation.

Here, assuming Love could show that Wayfair had notice of his disability, Love's failure to accommodate claim would still fail. Once an employee "communicates to [their] employer [their] disability and [their] desire for an accommodation," a "duty to engage in an interactive process to identify a reasonable accommodation is generally triggered." *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 346–47 (4th Cir. 2013)). The only accommodation that Love argues Wayfair should have provided was light duty, but the undisputed evidence demonstrates that Wayfair did not refuse to provide Love with a reasonable accommodation, but rather, Wayfair offered such accommodations to Plaintiff, and Love refused. That is, when Love returned to work on February 22, 2023, he asked Williams if he could drive the forklift. (ECF No. 29-5 at 13, 16–17.) Williams advised Love he would not be driving and had to return to Wayfair's Receiving Department until the investigation into the incident was over, and Love threatened to quit if he was reassigned to Receiving permanently. (*Id.* at 16.) On February 23, 2023, Love again asked if he could drive the forklift, with Williams again advising not until the investigation was over and Love again threatening to quit. (*Id.*) Later that same day, Love

31

asked Lee if he would lose his pay differential for operating the forklift as a result of not being able to work in Bulk. (*Id.* at 13.) After Lee confirmed that he would lose this "SEO pay," Love advised that he was quitting and walked off the job. (*Id.*; ECF No. 29-4 at 76–77.) While Love testified that he asked Lee if he could go to the doctor's because he was not feeling well and Lee told him to go ahead, (ECF No. 34 at 7–8; ECF No. 29-3 at 60), the simple fact is that he shall not be permitted to impose liability on his former employer for alleged failure to accommodate where he rejected the same accommodation that he now claims he demanded.

### B. Love's State Claim

This brings the Court to Plaintiff's state claim, wherein Love alleges wrongful termination in retaliation for his filing a workers' compensation claim, in violation of MD. CODE, LAB. & EMPL. § 9-1105. Having granted summary judgment as to all of his federal claims, the Court must first consider whether to exercise supplemental jurisdiction over Love's state claim.

A district court may exercise supplemental jurisdiction "over all other claims that are so related to claims in the action within [its] original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). But a district court "may decline to exercise supplemental jurisdiction" when it "has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c). A court has "wide latitude in determining whether or not to retain jurisdiction over state claims when all federal claims have been extinguished." *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995). Here, the Court will exercise its supplemental jurisdiction over Love's state claim, considering the "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial

economy," as prescribed in *Shanaghan*.

Turning to discuss the merits of Plaintiff's state claim, Section 9-1105 provides:

(a) An employer may not discharge a covered employee from employment solely because the covered employee files a claim for compensation under this title.

(b) A person who violates this section is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $500 or imprisonment not exceeding 1 year or both.

As this Court has explained, in order to prevail on such a claim, a plaintiff must show that they were "discharged solely and directly because of filing a workers' compensation claim." *Davis v. Balt. Hebrew Congregation*, 985 F. Supp. 2d 701, 718 (D. Md. 2013) (citations omitted). As noted, the record evidence demonstrates that Love was recommended for termination at 4:48 PM on February 24, 2023, (ECF No. 29-4 at 78), i.e., *before* Wayfair had any notice of Love's workers' compensation claim. As such, Love cannot show that it was the sole and direct reason, as required by statute and clear Maryland case law. *See, e.g.*, *Kern v. S. Balt. Gen. Hosp.*, 504 A.2d 1154, 1159 (Md. App. 1986). Accordingly, summary judgment shall be granted as to Claim Four.

## CONCLUSION

For the reasons stated above, (1) Love's Motion to Strike the Declaration of Shellie Weber and Exhibits (ECF No. 36) is DENIED; and (2) Wayfair's Motion for Summary Judgment (ECF No. 29) is GRANTED.

A separate Order follows.

Dated: July 8, 2025

                                        /s/
                                        _____
                                        Richard D. Bennett
                                        United States Senior District Judge